UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION, )
                                    )   11 CIV 8201
              Plaintiff,            )   ECF CASE
                                    )
         v.                         )
                                    )   COMPLAINT
TYRONE L. GILLIAMS, JR., and        )
TL GILLIAMS, LLC,                   )
                                    )
              Defendants.           )
                                    )

---

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1. This matter involves a fraudulent offering scheme orchestrated by defendant Tyrone L. Gilliams, Jr. ("Gilliams") through his company, defendant TL Gilliams, LLC ("TLG"), from at least June 2010 through April 2011. Gilliams raised at least $5 million from investors by claiming, among other things, to have a U.S. Treasury STRIPS Trading program (the "Treasury STRIPS Trading Program") in which he would pool investor money to purportedly provide sufficient buying power to engage in large purchases and sales of U.S. Treasury STRIPS. Gilliams claimed his trading program would yield weekly returns of five percent and was virtually risk-free.

2. Contrary to his representations about the Treasury STRIPS Trading Program, Gilliams did not invest any of the funds received from investors in any U.S. Treasury STRIPS, nor in any program that invested in U.S. Treasury STRIPS. Rather, Gilliams misappropriated the funds he obtained and used the money to, among other things, support his lavish lifestyle,

sponsor a so-called celebrity charitable event in Philadelphia, and make a large payment to an account in Ghana that he claims was an investment in gold.

3. To perpetrate his fraud, Gilliams, the architect of the scheme, communicated with and through a series of middlemen who had access to investors or who controlled investment funds themselves. Gilliams promised the middlemen varying fees, and Gilliams paid some of the middlemen from the $5 million he ultimately obtained.

4. Gilliams provided the middlemen and potential investors with false information about his own experience trading U.S. Treasury STRIPS and his purported Treasury STRIPS Trading Program, including information regarding investment minimums, the expected trading frequency, and the expected rate of returns.

5. By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants Gilliams and TLG have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such transactions, acts, practices, and courses of business and to obtain disgorgement, prejudgment interest, civil penalties, and such other and further relief as the Court may deem just and appropriate.

7. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. Venue in this district is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York, including in-person meetings with an individual who controlled investment funds and various telephone calls placed to a person within this judicial district during which Defendants made misrepresentations.

## DEFENDANTS

9. Tyrone L. Gilliams, Jr., ("Gilliams") age 44, of Philadelphia, Pennsylvania, is the owner and operator of TLG. Gilliams graduated from the University of Pennsylvania where he played on the men's varsity basketball team. While attending the University of Pennsylvania, Gilliams operated an "artist and concert promotions" business. After graduation, Gilliams continued that business, and, in or around 2000, Gilliams formed TLG. Gilliams also holds himself out to investors as a pastor.

10. TL Gilliams, LLC ("TLG"), a limited liability company organized under the laws of the State of New Jersey and purportedly headquartered in Bala Cynwyd, Pennsylvania, claims to be a commodities trading firm. TLG is not and has never been registered with the Commission. At all times, Gilliams (who was the President and CEO and a manager of TLG) controlled and operated TLG. In essence, TLG was an alter ego of Gilliams.

## OTHER RELEVANT PERSONS

11.  S.D., age 40, resides in West Palm Beach, Florida. S.D. purports to be someone who connects investors with investment opportunities.

12.  L.K., age 50, resides in Danville, California. L.K. purports to be someone who connects investors with investment opportunities.

13.  V.M., age 73, resides in New York, New York. V.M. was born in Athens, Greece, and became a United States citizen in 1966. He earned his Ph.D. in Engineering Sciences from Columbia University in 1964. He also received his master's and bachelor's degrees in Materials, Engineering and Natural Resources from Purdue University. As explained below, V.M. was named a Director of a foundation and was given responsibility for directing investments of a portion of that foundation's money.

## FACTS

### The Solicitation of the Investments

14.  U.S. Treasury STRIPS are the individual interest payment components of a United States Treasury bond, payable semi-annually over the life of the bond. For instance, a 30-year Treasury bond can be broken down into 60 individual STRIPS and one zero-coupon bond upon which principal payment is due from the government upon maturity. These STRIPS are then separately tradeable like other securities. The term STRIPS derives from the program implemented by the Treasury to facilitate this type of trading, entitled "Separate Trading of Interest and Principal of Securities."

15.  Sometime in early 2010, after having been introduced as part of a prior, ultimately unsuccessful investment, Gilliams represented to S.D. that he had a Treasury STRIPS Trading

Program through which he was able to buy and sell U.S. Treasury STRIPS to make large profits in a short amount of time, with very little risk.

16. Gilliams represented to S.D. that he, through his company TLG, would make all trading decisions about when to buy and sell the U.S. Treasury STRIPS.

17. Gilliams represented to S.D. that he needed a minimum of $5 million invested in his program in order to do a successful and profitable trading program.

18. Gilliams represented to S.D. that normally the trading of U.S. Treasury STRIPS was done in large amounts, such as $50 million to $100 million, but that he had recently done a smaller transaction in U.S. Treasury STRIPS.

19. At or around the time of the initial discussions between Gilliams and S.D., S.D. was also having discussions with L.K. about potential investment opportunities.

20. S.D. conveyed at least some of Gilliams' representations about the Treasury STRIPS Trading Program to L.K., and she participated in at least some direct telephone and e-mail communications with Gilliams about the Treasury STRIPS Trading Program.

21. L.K. conveyed information that she learned about the Treasury STRIPS Trading Program to another individual, who will be referred to as "J.T." and who was the CEO of an investment fund.

22. Based on the information conveyed by L.K., J.T. decided to invest $1 million of his investment fund's money with Gilliams.

23. At or around the time of her initial conversations with S.D., L.K. was also having conversations with V.M. about potential investment opportunities.

24. V.M. was a Director of a foundation. In his role as Director, he was responsible for directing investments of certain sums of money contributed by one particular investor, D.P.,

who had made his investment in the foundation through a limited liability company and a family foundation.

25. L.K. told V.M. about the investment opportunity with Gilliams.

26. L.K. then introduced V.M. to S.D., who repeated Gilliams' representations about the Treasury STRIPS Trading Program to V.M.

27. Gilliams had several direct communications with V.M. about the Treasury STRIPS Trading Program. During these communications, Gilliams repeated many of the representations about the program he had made to others.

28. For example, Gilliams and V.M. met in person in New York City in or about early July 2010. During that meeting, Gilliams represented to V.M. that if he invested in the Treasury STRIPS Trading Program, Gilliams would actively purchase and sell U.S. Treasury STRIPS in order to make a profit.

29. V.M. agreed to invest $4 million of the foundation's funds with Gilliams.

30. In order to obtain funds from investors, Gilliams made misrepresentations to, at a minimum, L.K., S.D., and V.M. After these conversations, J.T. and V.M. both agreed to invest in Gilliams' Treasury STRIPS Trading Program.

**The Parties Document Their Investment in Gilliams' Treasury STRIPS Trading Program and Send the Money to Gilliams' Trustee**

31. After several discussions between or among L.K., S.D., V.M., and Gilliams, the parties began to form the basis of an agreement and entered into a series of interrelated agreements.

32. On June 10, 2010, Gilliams and S.D. signed a Memorandum of Understanding. The terms of the Memorandum called for TLG to invest funds in U.S. Treasury STRIPS five to ten times daily, stating that the "[e]xpected profit per trade will be 1 point or best available

6

profit." That agreement also directed investment funds to be wired to a New Jersey law firm's IOLTA account (the "Trust Account") to be held by a Trustee before investment.

33.     On July 5, 2010, V.M., on behalf of his foundation, and L.K., on behalf of her entity ("G.C."), entered into an agreement to pool their funds in a joint venture and to invest the pooled funds in U.S. Treasury STRIPS.

34.     Then, on July 21, 2010, Gilliams and S.D. executed an Assignment relating to the earlier Memorandum of Understanding. That Assignment provided, in substance, that the joint venture between V.M. and L.K. would be assigned part of the interests in the Memorandum of Understanding such that Gilliams (on behalf of TLG) would agree to make the investments in U.S. Treasury STRIPS using funds invested by G.C. and by V.M.'s foundation.

35.     Through these agreements, and through his oral representations, Gilliams represented that he and TLG advised and operated a pooled investment vehicle which would purchase and sell U.S. Treasury STRIPS to make large, quick profits, with very little risk.

36.     None of the investors authorized Gilliams or TLG to invest their funds in investments other than a vehicle which would exclusively purchase U.S. Treasury STRIPS.

37.     At Gilliams' direction, and based on the above agreements and representations by Gilliams, J.T. wired $1 million to the Trust Account for investment in the Treasury STRIPS Trading Program.

38.     After the first $1 million was invested, at Gilliams' direction and based on the above agreements and representations by Gilliams, V.M. wired $4 million to the Trust Account for investment in the Treasury STRIPS Trading Program.

39.     Gilliams controlled and authorized the subsequent disbursement of the entire $5 million wired into the Trust Account.

7

40. Gilliams and TLG pooled and comingled portions of the investments from J.T. and V. M.

### Gilliams Invested None of the $5 Million as Promised

41. Gilliams used none of the $5 million that he caused to be sent to the Trust Account to purchase U.S. Treasury STRIPS or other U.S. Treasury securities. Instead, Gilliams used the investors' money for personal use, paying for his children's education, buying jewelry, and paying for international travel. In addition, Gilliams used the money to fund a series of so-called charitable events, and used the money for apparent investments in things other than U.S. Treasury STRIPS or related securities.

42. Shortly after receiving the first $1 million of investor money, Gilliams directed $325,000 to be wired directly from the Trust Account to a law firm in Utah as a payment relating to a prior transaction by Gilliams. Gilliams directed $250,000 to be wired directly from the Trust Account to an entity that was handling an investment for Gilliams in an Ohio hotel. Gilliams directed another $10,000 to pay someone who had introduced Gilliams to S.D. Gilliams directed the remaining $415,000 to be wired to a bank account in TLG's name. From the $415,000 wired to the TLG bank account, Gilliams caused approximately $355,000 to be used on a variety of Gilliam's personal and unrelated business expenses and at least $60,000 to be spent on transactions relating to a series of so-called celebrity charitable events called "JoyFest" that culminated in a black-tie gala on December 18, 2010, at the Ritz Carlton in Philadelphia.

43. Shortly after receiving the $4 million of investor money into the Trust Account, Gilliams directed $450,000 to an entity that appears to be associated with a private investment company trading in listed securities, over-the-counter securities, and initial public offerings. The notation on the wire said "Full Return of Escrow Deposit." Gilliams also permitted the attorney

8

acting as the Trustee to transfer $40,000 from the Trust Account to his own account, representing his fee for serving as the Trustee. Gilliams directed that the remaining $3,510,000 be wired to TLG's bank account (the same account that received funds from the $1 million investment) and a brokerage account titled in the name of TLG.

44. Gilliams used portions of this investor money in these accounts to make additional payments totaling $20,000 to a person who had introduced S.D. to Gilliams. Gilliams also spent over $300,000 on the purchase and renovation of property in Denver, Colorado, for use as a medicinal marijuana farm and dispensary. After transferring large sums of money, by check, from the brokerage account to the bank account, Gilliams also directed payments exceeding $70,000 to the Ritz Carlton for JoyFest and approximately $700,000 more in payments for other JoyFest-related expenditures. Gilliams wrote checks to other parties from that bank account exceeding $303,000.

45. Gilliams sent approximately $95,000 back to investors, claiming that the money was earnings on their investments, when in fact it was simply a portion of their principal.

46. In his single largest expenditure, on November 15, 2010, Gilliams caused TLG to wire $1,620,080 to Crown Financial Solutions in Accra, Ghana. This money purportedly related to an investment in gold in Africa.

47. Gilliams and TLG used much of the remainder of the $4 million to support Gilliams' extravagant lifestyle including expenditures on hotels, night clubs, airfare, designer apparel, luxury car rental, car payments, and private school tuition for his children.

48. Gilliams did not disclose to investors that their funds would be used for any purpose other than the purchase and sale of U.S. Treasury STRIPS.

### Gilliams' Efforts to Conceal His Misconduct

49. The day after the first $1 million investment was sent to the Trust Account, Gilliams sent a letter to S.D. stating that "an order to purchase One Million Dollars worth of Treasuries was placed by TLG. Settlement for the Treasuries will take place on Monday June 28, 2010 on a T+1 basis. Once I receive confirmation of the aforementioned, I will forward it to you."

50. Gilliams also sent S.D. a screenshot from Bloomberg Finance showing $1 million worth of U.S. Treasury STRIPS, which Gilliams represented was proof that he had purchased Treasury STRIPS.

51. Eventually, Gilliams did send some money to the investors, purportedly related to the returns on these investments. These payments totaled approximately $95,000. But none of these payments came from any return generated on any investment. Instead, the money came from the original principal invested.

52. In furtherance of the scheme, Gilliams also generated a document, which he supplied to a representative for the investors, in which he purported to show a series of $5 million trades, as well as over $100,000 in purported profits on trades during September and October of 2010. This document was false. Gilliams did not make any $5 million trades and did not actually generate over $100,000 for the investors.

### The Investors Sought to Have Their Investment Returned

53. Beginning in November 2010, not satisfied with the explanations given by Gilliams regarding why they had not seen the promised returns, L.K. and V.M. expressed to Gilliams, among other things, a demand to return the investment principal.

54. In late November or early December 2010, S.D. asked Gilliams to return the investment principal to the investors, and Gilliams told S.D. that he would return all of the funds at the end of the quarter. Gilliams explained that he wanted to wait until the end of the quarter because that was the end of the "trade cycle," and this would avoid tax implications.

55. In late December 2010, after another demand by S.D., Gilliams stated that, although he had the money, he could not return it because it was frozen as part of a civil litigation. This was false.

### Gilliams Continues to Raise Investor Funds

56. On February 28, 2011, Gilliams filed a Notice of Exempt Offering of Securities ("Form D") for Black Fox Funds, LLC ("Black Fox"). According to the Form D, Gilliams is the president of Black Fox. The Form D indicated that Black Fox, through TLG, anticipated raising an "indefinite" amount of funds from investors. Gilliams has undertaken steps to raise funds.

### Gilliams Made Materially False Statements and Omissions Regarding the Purported Treasury STRIPS Trading Program

57. The Treasury STRIPS Trading Program was a fraudulent scheme involving the offer and sale of fictitious securities in a non-existent investment program. Gilliams was the architect and mastermind of the scheme and engaged in conduct that had the principal purpose and effect of creating a false appearance of facts in furtherance of the scheme.

58. Gilliams based the entire scheme around his claimed ability to produce high returns with virtually no risk by investing in U.S. Treasury STRIPS and encouraged and induced the middlemen to locate and attract investors based on this false premise. He also induced a New Jersey attorney to serve as the Trustee of the invested funds, giving the program a false appearance of legitimacy.

11

59. The middlemen entered into agreements with investors and passed along false representations by Gilliams, all in furtherance of the scheme.

60. All of Gilliams' representations regarding the purported Treasury STRIPS Trading Program detailed above were false. Quite simply, there was no trading program.

61. Neither TLG nor Gilliams had organized any program or vehicle that would allow him to purchase and sell U.S. Treasury STRIPS in the manner Gilliams had represented, or that would generate five percent weekly profits with very little risk.

62. Neither Gilliams nor TLG ever purchased or sold any U.S. Treasury STRIPS with the $5 million invested by V.M. and J.T., and all of Gilliams' and TLG's representations to the contrary were false. For example, the written document described above in which Gilliams and TLG represented that they had purchased $1 million of Treasury securities on June 25, 2010, was not true, and the purported Bloomberg screenshot did not reflect purchases of U.S. Treasury STRIPS made by Gilliams on behalf of investors.

63. Gilliams also misrepresented his prior experience trading U.S. Treasury STRIPS.

64. Neither Gilliams nor TLG ever intended to purchase any U.S. Treasury STRIPS on behalf of the investors at the time Gilliams made the representations.

65. Once Gilliams received the investor funds, Gilliams used the funds for his own lavish lifestyle, to fund his own so-called charitable events, and to make other investments that were unrelated to treasuries.

66. Gilliams knew or was reckless in not knowing that investors were choosing to invest their money in his purported pooled investment vehicle based on his false representations described above, including the representation that that he would engage in the purchase and sale of U.S. Treasury STRIPS with an expected profit of five percent per week with very little risk.

67. Based on the above misrepresentations, at least two groups, representing more than two individuals, invested a total of $5 million with TLG and Gilliams. The investors wired funds into the Trust Account designated by Gilliams, and Gilliams knowingly and intentionally directed the disbursement of all funds from that account for his own use.

## FIRST CLAIM FOR RELIEF
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

68. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 67, inclusive, as if they were fully set forth herein.

69. Defendants Gilliams and TLG, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

70. By engaging in the foregoing conduct, Defendants Gilliams and TLG violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Section 17(a) of the Securities Act

71. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 70, inclusive, as if they were fully set forth herein.

72. Defendants Gilliams and TLG, by engaging in the conduct described above, knowingly or recklessly, in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) employed devices, schemes or artifices to defraud;

(b) obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

73. By engaging in the forgoing conduct, Defendants Gilliams and TLG violated, and unless enjoined and restrained will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendants Gilliams and TLG from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

**II.**

Ordering Defendants Gilliams and TLG to disgorge any and all ill-gotten gains together with prejudgment interest thereon, derived from the activities set forth in this Complaint;

**III.**

Ordering Defendants Gilliams and TLG to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

**IV.**

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Mary P. Hansen*
_____
Daniel M. Hawke
Elaine C. Greenberg
Mary P. Hansen (MH-9947)
G. Jeffrey Boujoukos
Scott A. Thompson
A. Kristina Littman

*Attorneys for Plaintiff*

U.S. Securities and Exchange Commission
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
HansenM@sec.gov

Dated:  November 14, 2011